[No. C066158. Third Dist. Aug. 2, 2011.]

DEPARTMENT OF FISH AND GAME et al., Petitioners, v.
THE SUPERIOR COURT OF PLUMAS COUNTY, Respondent;
IRA A. ADAMS et al., Real Parties in Interest.

## COUNSEL

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, James M. Schiavenza, Assistant Attorney General, Steven Gevercer, Alberto L. Gonzalez, Jill Scally and William A. Krabbenhoft, Deputy Attorneys General, for Petitioners.

No appearance for Respondent.

Diepenbrock Harrison, John V. Diepenbrock, David A. Diepenbrock, Jennifer L. Dauer, Anthony J. Cortez; Robertson & Benevento, G. David Robertson and Jarrad C. Miller for Real Parties in Interest Ira A. Adams, Anthon Olsen,

Sylvia Olsen, Frank L. Genescritti, Patricia A. Genescritti, Judy Ann Genescritti, Sleepy Hollow RV Park, LLC, and Genescritti Family Trust.

Porter Simon and Steven C. Gross for Real Party in Interest City of Portola.

---

OPINION

HULL, J.—In this mandamus proceeding, petitioners-defendants seek to overturn a decision of the Superior Court of Plumas County certifying the underlying dispute as a class action. Real parties in interest-plaintiffs are various real property or business owners or operators and the City of Portola, all of whom are located near Lake Davis in Plumas County. (For purposes of clarity, petitioners shall be referred to as defendants and real parties in interest shall be referred to as plaintiffs.) They claim to have been harmed by efforts of the Department of Fish and Game (DFG) in 2007 to eradicate an invasive species of fish, the northern pike, from the lake and its tributaries in order to preserve tourism in the area and to prevent migration of the fish to other bodies of water.

Plaintiffs allege defendants' efforts created a decline in tourism that adversely affected business income, property values and tax receipts for the period leading up to and following the eradication effort. They assert claims for public nuisance, negligence, inverse condemnation, various types of business interference, strict liability, and equal protection.

Resolution of the class certification issue turns primarily on whether the legal and factual issues that must be resolved in this dispute are predominantly common to all class members or must be determined on an individual basis. The trial court concluded common issues predominate.

We conclude the trial court applied incorrect legal criteria and made erroneous legal assumptions in resolving the predominance issue, thereby rendering its decision an abuse of discretion. We therefore grant the requested relief.

FACTS AND PROCEEDINGS

As alleged in the complaint, northern pike were first discovered in Lake Davis in 1994 and, in 1997, DFG undertook to eradicate the species from the lake and its tributaries by applying a poison (the 1997 poisoning). The Legislature thereafter determined residents in the area had suffered economic harm as a result of the 1997 poisoning and appropriated $9,176,000 to compensate them. (Gov. Code, § 998.)

The 1997 poisoning was unsuccessful in eliminating the northern pike. Between 1999 and 2006, DFG attempted to control and contain the species. However, this too proved ineffective and DFG decided once again to poison the lake. This second poisoning occurred in September 2007. In addition to applying poison to the lake, DFG "widely publicized the [plan to poison the lake], closed all roads that access Lake Davis during the [poisoning] and placed large, blinking Department of Transportation signs on Highway 70 to advise the general public of Lake Davis's closing. The signs were unclear and misleading, which led the general public to believe that the entire area, including the City of Portola, was closed." DFG "left the large road signs up for more than a week after the roads to Lake Davis were actually re-opened, unnecessarily creating the continued appearance that the City of Portola and surrounding vicinity were closed." The forest around Lake Davis remained closed from September 2007 through January 2008 and the lake was not certified for reuse as a source of drinking water until May 2008. (Hereafter, the foregoing acts attendant to the second poisoning effort, as well as the poisoning itself, are referred to collectively as the 2007 poisoning.)

Plaintiffs Ira A. Adams, Anthon and Sylvia Olsen, Frank L., Patricia A. and Judy Ann Genescritti, the Genescritti Family Trust, Sleepy Hollow RV Park, LLC, and the City of Portola filed claims with the California Victim Compensation and Government Claims Board (Claims Board) (see Gov. Code, § 900.2) for damages caused by the 2007 poisoning. Their claims were rejected. Plaintiffs then commenced this action on behalf of themselves and all others similarly situated. Named as defendants are DFG, John McCamman, the former acting director of DFG, and two DFG employees, Ed Pert and Randy Kelley. The first amended complaint contains nine causes of action: (1) public nuisance; (2) negligence; (3) inverse condemnation; (4) intentional interference with economic relationship; (5) negligent interference with economic relationship; (6) intentional interference with prospective economic relations; (7) negligent interference with prospective economic relations; (8) strict liability; and (9) equal protection.

Plaintiffs moved for certification of the following three subclasses:

"Class A: All persons, entities and/or political subdivisions owning and/or operating one or more businesses in the Lake Davis area that timely submitted one or more claims to the Claims Board for damages suffered as a result of the [2007 poisoning], and whose claims were rejected by the Claims Board.

"Class B: All persons, entities and/or political subdivisions owning real property in the Lake Davis area during the relevant time period that timely submitted one or more claims to the Claims Board for damages incurred as a

result of the decrease in real property values, loss of real property income or lost sales of real property, suffered as a result of the [2007 poisoning], and whose claims were rejected by the Claims Board.

"Class C: All persons, entities and/or political subdivisions that were injured by the [2007 poisoning], including, but not limited to lost property and sales tax revenues, lost economic development and economic growth, or suffered any other loss alleged in the First Amended Complaint as a result of the [2007 poisoning], and that timely submitted one or more claims to the Claims Board, and whose claims were rejected by the Claims Board."

In support of their motion, plaintiffs submitted the declarations of Arthur Gimmy, a professional property and business appraiser, Dr. James Robert Fountain, a consultant in real estate and land development, Jeff Rogers, an accountant specializing in the determination of business losses, and Estelle Saltzman, a public relations specialist.

Gimmy claimed he could determine overall lost real property values in the Lake Davis area caused by the 2007 poisoning by comparing property value fluctuations in that area during the relevant period with those in a comparable area and attributing any discrepancy to the 2007 poisoning. Dr. Fountain suggested the same approach could be used to determine the amount of overall business decline in the Lake Davis area caused by the 2007 poisoning. In other words, any business decline in the area not also experienced in other, comparable areas must be attributable to the 2007 poisoning. Rogers claimed he could use a common methodology to compute the losses suffered by any particular business in the area. Finally, Saltzman indicated a marketing effort to revitalize Lake Davis tourism would cost between $1 million and $1.5 million each year for the next three years.

In opposition to plaintiffs' motion, defendants submitted the declarations of Dr. Michael J. Harris, an economist, James W. McCurley, an accountant, and Reese Perkins, a real estate appraiser. Dr. Harris opined that a classwide methodology could not be used to determine business losses in light of significant differences in the natures of the various businesses included in plaintiffs' proposed class A. Dr. Harris also asserted real property losses among class B members would necessarily vary depending on whether the property was used for a business or a residence and whether the owner attempted to sell during the relevant period. McCurley likewise opined that a single format approach to calculating business losses in class A would not be appropriate under the circumstances because of differences in the businesses. Finally, Perkins indicated a case-by-case analysis would be necessary to evaluate adverse impacts on individual parcels of property.

The trial court granted the motion for class certification. The court explained: "The predominant legal issue: whether the actions taken by DFG to eradicate Northern Pike in 2007 resulted in a common impact based upon the causes of action alleged, and the predominant factual issues: what were the actions taken by DFG to eradicate Northern Pike in 2007, are amenable to class treatment." The court analyzed each of plaintiffs' nine causes of action and concluded they primarily involve common issues.

On September 24, 2010, defendants filed a petition for writ of mandate in this court seeking to reverse the trial court's order. On October 15, we issued an alternative writ of mandate.

DISCUSSION

I

*Introduction*

■ Code of Civil Procedure section 382 authorizes class actions when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ." (Code Civ. Proc., § 382.) "Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system. [Citations.] ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . ." ' [Citation.] Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 434–435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).)

■ In order to obtain class certification, a proponent must demonstrate the existence of both an ascertainable class and a well-defined community of interest among the proposed class members. (*Linder, supra,* 23 Cal.4th at p. 435.) "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981)

29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) ▮ "The predominance factor requires a showing 'that questions of law or fact common to the class predominate over the questions affecting the individual members.' [Citation.] 'The ultimate question in every case of this type is whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 410 [17 Cal.Rptr.3d 1].)

"A class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or her damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 397 [112 Cal.Rptr.2d 99].) "Individual issues do not render class certification inappropriate so long as such issues may effectively be managed." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On Drug Stores*).)

"A trial court's order granting or denying class certification is subject to review for abuse of discretion." (*In re Cipro Cases I & II, supra*, 121 Cal.App.4th at p. 409.) "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder, supra*, 23 Cal.4th at p. 435.) " 'Our task on appeal is not to determine in the first instance whether the requested class is appropriate but rather whether the trial court has abused its discretion . . . .' " (*Reese v. Wal-Mart Stores, Inc.* (1999) 73 Cal.App.4th 1225, 1233 [87 Cal.Rptr.2d 346].)

Nevertheless, the trial court's ruling must be reversed if its findings are not supported by substantial evidence, if improper criteria were used, or if erroneous legal assumptions were made. (*In re Cipro Cases I & II, supra*, 121 Cal.App.4th at p. 409.) "The appeal of an order denying class certification presents an exception to the general rule that a reviewing court will look to the trial court's result, not its rationale. If the trial court failed to follow the correct legal analysis when deciding whether to certify a class action, 'an appellate court is required to reverse an order [granting] class certification . . . , "even though there may be substantial evidence to support the court's order." ' " (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828 [97 Cal.Rptr.2d 226].)

II

*The Predominance Issue*

The trial court in this case issued a 22-page opinion that reviewed the evidence presented by the parties and analyzed the various legal and factual issues presented by the claims alleged in the complaint. The court initially concluded there is an ascertainable class, an issue that does not appear to be disputed in light of the fact all class members were purportedly identified by name in exhibit A to the complaint. The court then determined that issues of fact and law common to all class members predominate over individual issues. Next, the court found the named plaintiffs have claims typical of the class and can provide adequate representation. Finally, the court concluded plaintiffs adequately demonstrated that proceeding in a class action format would be advantageous both to the litigants and to the court.

Defendants contend the trial court abused its discretion in concluding common issues predominate in this matter. According to defendants, this case "is predicated on facts peculiar to each proposed plaintiff regarding both liability and damages" and there are many diverse issues as to how each class member may have been impacted by the various aspects of the 2007 poisoning. Defendants argue "no class-wide economic or financial model or formula could be devised to calculate damages for these diverse claimants." Instead, the circumstances of each class member "must be scrutinized to assess impact and damages."

Defendants place particular reliance on *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447 [115 Cal.Rptr. 797, 525 P.2d 701] (*City of San Jose*), where the plaintiffs sued the city on behalf of all real property owners located in the flight pattern of the San Jose Municipal Airport. They alleged nuisance and inverse condemnation and sought recovery for diminution in market value of their individual properties. (*Id.* at pp. 452–453.) The trial court found the matter appropriate for class treatment, but the California Supreme Court disagreed and granted the city's petition for extraordinary relief. (*Id.* at p. 465.)

According to the high court, "the community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' determining issues common to the purported class." (*City of San Jose, supra*, 12 Cal.3d at p. 459.) The court found the matter before it to be such a case: "[T]he present action for nuisance and inverse condemnation is predicated on facts peculiar to each prospective plaintiff. An approaching or departing aircraft may or may not

give rise to actionable nuisance or inverse condemnation depending on a myriad of individualized evidentiary factors. While landing or departure may be a fact common to all, liability can be established only after extensive examination of the circumstances surrounding each party. Development, use, topography, zoning, physical condition, and relative location are among the many important criteria to be considered. No one factor, not even noise level, will be determinative as to all parcels. [¶] The uncontradicted evidence reveals the development, character, and uses of the geographic region of this proposed class are diverse. Within the region are industrial plants, public buildings, body shops, warehouses, gas stations, office buildings, multi-unit apartments, single family residences, and vacant land—some being farmed. The region is bisected by a major thoroughfare and bounded by a highway. Finally, a railroad right-of-way passes through a portion of the proposed region." (*Id.* at pp. 460–461, fn. omitted.)

The high court also rejected the plaintiffs' attempt to divide the purported class into subclasses and to determine, as to each subclass, the overall diminution in value. According to the court, such a "scheme is incompatible with the fundamental maxim that each parcel of land is unique. [Citations.] Although this rule was created at common law, the very factors giving it vitality in the simple days of its genesis take on added significance in this modern era of development. Simply stated, there are now more characteristics and criteria by which each piece of land differs from every other." (*City of San Jose, supra,* 12 Cal.3d at pp. 461–462.) Furthermore, the court reasoned, "even were we to allow a subclassification process here, the factors giving the uniqueness rule vitality would serve to break down the alleged beneficial aspects which such a process might yield under these facts, making a class action here unmanageable. Given the many recognized factors combining to make up the uniqueness of each parcel of land, the number of subclassifications into which the class would be required to be divided to yield any *meaningful* result would be substantial. Then, because liability is here predicated on variables like the degree of noise, vapor, and vibration, the problem is compounded by the factors of distance and direction affecting these variables. The result becomes a statistical permutation, and the requisite number of subclassifications quickly approaches the total number of parcels in the class. Under such circumstances, there is little or no benefit in maintaining the action as a class." (*Id.* at p. 462.)

Defendants contend the liability and damage issues presented in the present matter are "far more individualized" than those in *City of San Jose.* According to defendants, the real property at issue here includes rental properties, owner-occupied properties, commercial properties, properties located near Lake Davis, properties located elsewhere, properties the owners attempted to sell and properties the owners did not attempt to sell. They further assert the businesses at issue "range from a tent rental business to a drug testing facility

to a women's advocacy organization." Defendants argue that because of the wide diversity of class members and properties, each member will be required to prove both liability and damages, and common issues are few and "certainly do not predominate."

Plaintiffs argue *City of San Jose* did not establish a per se bar to class certification in actions involving nuisance and inverse condemnation claims or where each member's right to recover depends on facts individual to that member's case. They cite *Sav-On Drug Stores*, where the high court said: "[T]he Court of Appeal erroneously cited *City of San Jose* . . . in suggesting trial courts must 'deny class certification when each member's right to recover depends on facts individual to the member's case.' In [*City of San Jose*] the trial court had certified a class of property owners pressing claims against a municipal airport. We reversed, remarking at one point that the general rule 'that a class action cannot be maintained where each member's right to recover depends on facts peculiar to his case . . . remains viable in this state.' [Citation.] But reading this categorical extract out of context would misstate the established legal standard for commonality, which . . . is comparative. Our holding in [*City of San Jose*] was, in fact, expressly comparative [citation], and we consistently have adhered to that approach [citation]." (*Sav-On Drug Stores, supra,* 34 Cal.4th at pp. 338–339, fn. omitted.)

 Plaintiffs essentially set up and knock down a straw man. Nowhere do defendants claim *City of San Jose* created a per se rule with respect to nuisance and inverse condemnation claims or claims involving any degree of individual proof. *City of San Jose* clearly applied a comparison standard, whereby those issues that may be subject to common adjudication are compared with those requiring individual determination. The court merely concluded that, in light of the claims asserted and the individualized nature of the property involved, the trial court abused its discretion in determining that common issues predominated. Defendants, for their part, argue the issues presented in this matter are even more individualized than those in *City of San Jose*, thereby necessitating the same result.

Plaintiffs argue the trial court correctly concluded *City of San Jose* is "easily distinguished" from the present matter on the basis that "[t]he class proposed in *City of San Jose* did not involve a common nucleus of operative facts arising from a single incident" but rather "landowner claims with no temporal limitation on the class."

We fail to see how the fact the conduct alleged in *City of San Jose* did not involve a single incident distinguishes that case from the present one. Whether plaintiffs' damages arose from a single incident or a continuum of

conduct over time, the question for purposes of class certification remains to what extent the issues of liability and damages may be determined on a collective basis. There is no logical reason why a single act causing injury should be treated differently from a series of acts causing injury. In *City of San Jose*, it was not the nature of the misconduct but the uniqueness of the individual parcels, in light of the claims asserted, that made class treatment inappropriate. In the present matter, the trial court was required to determine whether the uniqueness of the individual properties and businesses, in light of the claims asserted, likewise makes class treatment inappropriate.

The trial court also purported to distinguish *City of San Jose* on the basis that, in the present matter, uniqueness of the individual parcels of property is not an obstacle to class treatment because "the problems of liability and the calculation of diminished value of each parcel in this case do not depend upon the same variables [as] in *City of San Jose* because Plaintiffs do not allege similar damages on their land as such." We are not altogether certain what the trial court meant by the foregoing. The loss sought to be recovered by the class B plaintiffs here, like the plaintiffs in *City of San Jose*, is the diminished value of their property resulting from the defendants' conduct. On the other hand, in *City of San Jose*, at least a portion of the alleged diminished value claimed by the plaintiffs was caused by the physical invasion of their property by dust, noise, and vibrations. Plaintiffs' theory in this matter does not appear to be based on any such physical invasion. Rather, plaintiffs appear to allege the 2007 poisoning caused people to stay away from the area in general and created a *perception* that the area around Lake Davis was somehow tainted, thereby driving down property values on more or less a uniform basis.

In light of this difference in theories, uniqueness of the individual parcels may have been more of a factor in *City of San Jose* than it is here. However, this is a difference in degree rather than kind. It remains a question of assessing the issues presented in terms of whether those that may be determined on a common basis predominate over those that require individual adjudication. As explained more fully hereafter, the impact of the 2007 poisoning, like the impact of a physical invasion in *City of San Jose*, may be different depending on the particular characteristics and location of each individual parcel. And, in light of the claims asserted by plaintiffs, these differences are more than just a matter of damages, but go to the fundamental issues of liability.

Defendants cite a number of other decisions which, they argue, support denial of class certification in the present matter. For example, in *Frieman v. San Rafael Rock Quarry, Inc.* (2004) 116 Cal.App.4th 29 [10 Cal.Rptr.3d 82] (*Frieman*), two individuals living near a quarry brought an action against the

operator on behalf of themselves and all others similarly situated alleging unlawful business practices and nuisance. (*Id.* at pp. 31–32.) The plaintiffs moved for certification of two classes, one for the unlawful business practices claim and another for the nuisance claim. (*Id.* at p. 33.) The trial court denied the motion, concluding the plaintiffs failed to show any need for a class to pursue the disgorgement remedy on their unlawful business practices claim and failed to show common questions predominated as to the nuisance claim. (*Ibid.*)

The Court of Appeal affirmed. Expert evidence submitted by the defendant established that variations in noise experienced at different locations in the class area depended on the distances between the noise sources and the homes and the presence of any shielding provided by natural terrain, intervening homes or vegetation. As a result, in many locations, homes within a few hundred feet of each other could have dramatically different noise exposures. In addition, noise exposure could also vary depending on the orientation of rooms in a home, the nature of the furnishings, the size and construction of windows and whether windows are open or closed. (*Frieman, supra,* 116 Cal.App.4th at p. 39.) Further expert evidence established that the impact on individual homes from blasting activities at the quarry depended on "the presence of rock or soil formations that alter the frequency of blast waves, the natural or 'resonant' frequencies in each structure that change the response to vibration, distance from the blast site and differences in the duration of the blasts." (*Ibid.*)

The appellate court distinguished the matter from cases in which class certification was found to be appropriate despite the fact each class member would be required to prove individual damages. The court found the case before it would require not only individual proof of damages but individual proof of liability. The court analogized the situation presented to that in *City of San Jose*: "The *City of San Jose* case is similar to this case, and its rationale supports the trial court's decision. The variables that prevented class treatment in *City of San Jose* are analogous to the variables present in this case. Rather than mere variations in the measure of damages, these factors are the keys to defendant Quarry's liability. Whether each resident even heard or felt the impact of Quarry's operations is subject to separate and differing matters of proof. Each resident would have to prove interference with the comfortable enjoyment of life or property and that the interference was '*substantial* and *unreasonable.*' [Citation.] Plaintiffs produced no evidence that these issues do not vary significantly as to each individual in the defined area." (*Frieman, supra,* 116 Cal.App.4th at p. 42.)

Defendants also cite *Eaton v. Ventura Port Dist.* (1975) 45 Cal.App.3d 862 [119 Cal.Rptr. 746] (*Eaton*). In *Eaton,* the plaintiffs were members of an

organization known as the Ventura Marina Protective Association who filed a class action for declaratory relief and damages on behalf of 160 named association members and a class of unnamed persons who owned boats and other property that was damaged or destroyed when the Santa Clara River overflowed and flooded the Ventura Marina. (*Id.* at p. 864.) The named defendants were various public entities, including the Ventura Port District, which designed and operated the marina, the City of San Buenaventura, where the marina was located, and various flood control districts. (*Id.* at p. 865.) Among the many causes of action of the complaint were claims for negligent design and construction of the marina, negligent failure to warn of impending disaster and negligent failure to safeguard property. (*Ibid.*) The plaintiffs sought damages in the form of reduced value or destruction of boats, damage to other personal property, loss of occupancy, loss of use, personal injuries, and other damages. (*Ibid.*) The trial court concluded the matter could not be maintained as a class action for several reasons, including the absence of a well-defined community of interest in the issues presented. (*Id.* at p. 866.)

The Court of Appeal affirmed, concluding "the theories of liability as alleged in the complaint are so diverse and individualized that they fail to portray [the necessary] community of interest." (*Eaton, supra*, 45 Cal.App.3d at p. 869.) Quoting the trial court, the Court of Appeal explained: " '[T]he number, variety and the diversity of the individual plaintiffs' respective claims, the number, variety and diversity of the legal theories under which such claims are asserted, and the number, variety and diversity of the individual defendants against some or all or none of whom such claims are made demonstrate a contrariety of issues of both law and fact not countenanced by [Code of Civil Procedure] Section 382, . . . as the requisites for maintaining a class action.' " (*Ibid.*) The court continued: "The pleadings of the representative plaintiffs demonstrate that even as among themselves they are not 'similarly situated.' Hence, the unnamed plaintiffs, who are characterized as 'persons similarly situated' to the representative plaintiffs, could not by virtue of that magic phrase be transformed into a well-defined and ascertainable class. The only common feature appearing in the various allegations is the flooding of a river." (*Ibid.*) In other words, the only common feature among the purported class members was the damaging event. Liability of the individual defendants for the plaintiffs' losses and the resulting damages would have to be determined on an individual basis.

Plaintiffs contend the foregoing cases, with the exception of *City of San Jose*, are readily distinguishable from the present matter by the simple fact that in each, the trial court denied class certification and the state Court of Appeal affirmed. In other words, all the Court of Appeal concluded was that substantial evidence supported the trial court's decision. Plaintiffs, for their

part, cite several federal decisions where, they claim, the facts were similar to the present matter and the court found class certification proper.

In *Sterling v. Velsicol Chemical Corp.* (6th Cir. 1988) 855 F.2d 1188, individuals who either lived or owned property near the defendant's landfill brought an action for personal injuries and property damage allegedly resulting from hazardous chemicals leaking from the landfill and contaminating the local water supply. The federal district court certified the case as a class action and ultimately held the corporation liable on theories of strict liability, negligence, trespass, and nuisance. (*Id.* at pp. 1192, 1194.)

The federal court of appeals affirmed class certification and the determination of liability but disagreed on the calculation of damages. On the issue of class certification, the court concluded common issues of law and fact predominated. The court explained that in typical mass tort accidents, the factual and legal issues of liability do not differ dramatically from one plaintiff to the next. (*Sterling v. Velsicol Chemical Corp., supra*, 855 F.2d at p. 1197.) As for the case before it, the court concluded: "[E]ach class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using the contaminated water. Almost identical evidence would be required to establish the level and duration of chemical contamination, the causal connection, if any, between the plaintiffs' consumption of the contaminated water and the type of injuries allegedly suffered, and the defendant's liability. The single major issue distinguishing the class members is the nature and amount of damages, if any, that each sustained." (*Ibid.*)

Plaintiffs also cite *Olden v. Lafarge Corp.* (6th Cir. 2004) 383 F.3d 495, in which the plaintiffs brought a class action on behalf of 3,600 owners of residences in a particular town against a local cement manufacturer alleging personal injury and property damage caused by toxic pollutants discharged from the cement plant. The district court granted class certification (*id.* at pp. 496–497), and the federal court of appeals affirmed, concluding common issues predominated notwithstanding the need for individual determination of damages. The court explained that, while there were individual complaints of personal medical problems, the thrust of the personal injury portion of the case "appears to be related to the general increased risk of the class suffering medical problems in the future." (*Id.* at p. 508.) Similarly, while individuals claimed specific instances of property damage, these "seem to be no more than illustrative of the common argument that the class's properties are regularly covered in cement dust, causing minor property damage and a predictable reduction of property value and enjoyment of the property." (*Ibid.*) According to the court, these types of harm can likely be determined for the class as a whole. (*Id.* at pp. 508–509.)

█ It is not lost on this court that while plaintiffs attempt to distinguish *City of San Jose* on the basis that it involved a continuum of conduct over time rather than a single incident, they cite as support for class certification here cases which also involved a continuum of conduct. At any rate, the foregoing cases, as well as those cited by defendants and others cited by the parties, merely stand for the unremarkable proposition that there is no per se rule in assessing class certification and each case must be considered on its own merits in light of the circumstances presented and the claims asserted. With this in mind, we turn to the particular circumstances of this case.

## III

### *Expert and Other Evidence*

In support of their motion for class certification, plaintiffs argued they will be able to use evidence common to all class members to prove defendants' acts were wrongful and caused overall injury to the class, with only the assessment of individual damages requiring separate proof.

Much of plaintiffs' case for class certification relies on the expert opinions of Dr. Fountain and Mr. Gimmy. Dr. Fountain has a Ph.D. in economics and is a consultant in real estate and land development issues. He analyzed general income, employment, retail sales, housing, and other data for the period from 2006 through 2008 to identify four counties he considered to be comparable to Plumas County, where Lake Davis is located—Butte, Lassen, Shasta and Sierra (the control counties). Dr. Fountain then found there were general economic declines in Plumas County during the relevant period that were not shared by the control counties and the only explanation for this was the 2007 poisoning.

In his initial declaration, Dr. Fountain explained he analyzed economic activity during the 1997 to 1999 timeframe, corresponding to the 1997 poisoning, and found an economic decline in the Lake Davis area of $4,484,358 that was attributable to the 1997 poisoning. For the period of 2006 to 2008, the decline in the Lake Davis area attributable to the 2007 poisoning was approximately $5.5 million. Adding declines during 2005 and 2006, the period after the state announced its intent to conduct the 2007 poisoning, Dr. Fountain found the total decline in the area exceeded $10 million.

In a subsequent declaration, Dr. Fountain clarified the methodology used to determine economic declines in the Lake Davis area. He explained that his approach was intended to be "comprehensive in defining economic impacts, rather than focusing on retail sales, housing prices, tax revenues, business

profits, or other definitions which exclude major parts of the economy." Dr. Fountain chose to use as the basis for his analysis total employment data compiled by California's Employment Development Department and the United States Bureau of Labor Statistics by city, Zip Code and county. He then converted such employment data into economic data using information available from the U.S. Bureau of Economic Analysis. Dr. Fountain chose a countywide approach because, as he explained, "[t]he overall affect [sic] of [the 2007 poisoning] on tourism was not confined to the immediately adjacent City of Portola or even to the larger Portola Market Area (Zip 96122) but also affected other areas of Plumas County, not only those near Portola but also communities along major highways which provide attractions and services to Sierra area visitors."

Dr. Fountain explained that economic impacts are not limited to businesses engaged in tourism or expenditures made by those visiting the area: "The local firms which provide these services make what are called indirect expenditures: purchases from other businesses including the goods which the retailers sell; professional services such as accountants, attorneys, advertising and financial services; utilities; property rental and repairs; transportation; a wide spectrum of public services and utilities; and, of course, employees wages and benefits."

Dr. Fountain analyzed economic impacts for three geographic areas: (1) the City of Portola; (2) Zip Code 96122, which encompasses Portola and areas adjacent to Portola, including that around Lake Davis; and (3) Plumas County. Overall, Dr. Fountain concluded the total economic impact caused by the 2007 poisoning for the City of Portola was $10,752,256; for Zip Code 96122, $18,734,055; and for Plumas County, $81,345,899.

Plaintiffs' expert on property values, Arthur Gimmy, approached his task by locating a community comparable to that around Lake Davis and comparing the trend in property values in that area to that in the Lake Davis area for the period from 1993 through October 2009. The comparable area he selected was that near Lake Almanor, another Northern California lake also in Plumas County. From this data, Gimmy determined that, "[i]n 2005, Lake Davis area property values declined sharply relative to Lake Almanor . . . ." According to Gimmy, such a "dramatic" decline "can be attributed only to a unique event that would affect market perceptions of the Lake Davis area." Gimmy further opined that the only such event in the Lake Davis area during that period was the 2007 poisoning. According to Gimmy, although the actual poisoning did not occur until 2007, it had been announced in 2005. Thus, the poisoning must be viewed as a continuing event that commenced in 2005, when property values in the Lake Davis area began to decline relative to those in the Lake Almanor area.

In his later deposition, Gimmy acknowledged that, in order to determine the loss in value of each property in class B, it would be necessary to do individual appraisals. He further explained he could come up with a methodology for appraising such properties both with and without consideration of the 2007 poisoning.

Plaintiffs also relied on the expert opinion of Jeff Rogers, an accountant specializing in determining economic damages. Rogers indicated he has not yet been asked to do a damage analysis in this case. However, he explained that, if asked to do so, his firm "would develop a damages model applicable to each claimant based on interviews, financial records and economic research." Relying on Dr. Fountain's assessment as to the amount of overall business decline attributable to the 2007 poisoning, Rogers's firm would review the same categories of records from each business, i.e., "tax returns, financial records, as well as invoices and receipts" and apply the common model to assess damages. Rogers also explained that a common methodology based on national averages could be used to determine if and by how much any business sold during the relevant period sold for less than it would have but for the 2007 poisoning.

In his deposition, Rogers explained that the model to be used may look at either profits or changes in business valuation, but the approach would be the same regardless of the type of business. Rogers acknowledged that different businesses could have different periods during which they were adversely affected by the 2007 poisoning. He also acknowledged that he might potentially use different methodologies to measure the damages suffered by different subcategories, such as business owners, business owners who also own real property, and property owners.

Plaintiffs' final expert was Estelle Saltzman, a public relations specialist. Saltzman indicated she had been asked to work up a three-year marketing plan "to re-establish Lake Davis as a premier Northern California fishing destination amongst serious and recreational anglers." Saltzman estimated the cost of such effort would run about $1 million to $1.5 million for each of the three years.

Plaintiffs also submitted the declarations of several class members. Anthon Olsen owns and operates a cabin rental business near Lake Davis that is dependent on tourism. Olsen indicated that, before the 2007 poisoning, his business regularly operated at a profit, but the 2007 poisoning drastically reduced the patronage at his business.

Frank Genescritti owns and operates an RV park near Lake Davis that likewise depends on tourism. Like Olsen, Genescritti indicated he regularly

operated the business at a profit before the 2007 poisoning, but his business was drastically reduced thereafter.

In opposition to plaintiffs' motion, defendants submitted the 51-page declaration of Dr. Michael J. Harris, who, like Dr. Fountain, holds a Ph.D. in economics. Putting aside his extensive and totally irrelevant review of class action history and law, Dr. Harris opined that "the variety of conduct being alleged by the Plaintiffs could not have had a common impact on all class members nor could one develop a class-wide common methodology to calculate damages—even assuming there was some measurable impact." Dr. Harris pointed to the varying natures of the class members and opined: "While the dissimilarities between and across class members are striking, it is the complete absence of a causal link between the Defendants' conduct and impact to the Plaintiffs that speaks directly against an assumption of common impact. One of the Plaintiffs' arguments is that the Defendants' conduct harmed tourism. If true, one might be able to argue the lakeside tent rental business was harmed, but could not logically assume that the drug testing facility, the jeweler, or the plumber was harmed—whose businesses have nothing to do with tourism. Further, there is simply no class-wide metric that can be used to establish whether there was common impact." Dr. Harris expressed a similar opinion as to the losses claimed by real property owners.

Dr. Harris continued this theme a little later in his declaration, but with more detail: "[T]he closure of Lake Davis could be said to reduce the patronage at the RV and tent rental site, thus directly affecting its revenues. However, one could not argue prima facie that the closure reduced the number of people getting tested for drugs or buying jewelry. There is simply no causal mechanism to make such a direct inference. The only inference that could potentially be drawn (yet not established) is that the lower patronage at the RV and tent rental site caused the owner of that business and its employees to purchase fewer drug testing services and jewelry. However, there is nothing in the economic record to suggest the owners or its [sic] employees even purchase drug testing services or jewelry." Dr. Harris continued: "Assuming it is determined that the RV business owners and employees do not purchase drug testing services or jewelry, one is then forced to argue that the impact was tertiary. For example, the story would be that the reduced patronage at the RV and tent rental business caused its owners and employees to reduce their demand for, say, hair salon services or lessen the number of nights spent at the local night club, which in turn caused the owners and employees of these businesses to purchase fewer drug testing services and jewelry. Again, there is nothing in the economic record to draw these sorts of inferences."

Dr. Harris also took issue with lumping real property losses of homeowners with real property losses of business owners, inasmuch as the value of

business property depends to a large extent on the amount of income to be derived from the business, which has no bearing on the value of personal residences. Further, as to personal residences, Dr. Harris opined that lumping those who attempted to sell their property during the relevant period with those who did not makes no sense, inasmuch as any decrease in value from the 2007 poisoning would likely have been temporary.

Finally, Dr. Harris opined that class C is much too amorphous to identify a cohesive class. Either it includes widely differing claimants, such as a fisherman who claimed to have lost recreational value during the closure of Lake Davis, or it is limited to the City of Portola alone, neither of which is an appropriate class.

Defendants' other expert on economic impacts was James W. McCurley, an accountant who opined that a single-format approach to calculating economic losses of businesses in the Lake Davis area "would be inaccurate and not appropriate under the circumstances." He based this on his knowledge of the area and "the varied nature of the industries within the business community of the Lake Davis Area, the different economic pressures and influences felt by different industries, the differing levels of bookkeeping sophistication and recordkeeping methodologies used by different businesses and individuals, and changes in local economic influences specific to individual businesses but unrelated to the treatment of Lake Davis, including changes in contractual relationships, competition and the labor force among others." And, as explained more fully by Dr. Harris, the impact on tourism would be felt differently by a marina owner and a nail salon.

Defendants' real estate appraiser, Reese Perkins, likewise indicated a case-by-case analysis would be necessary to evaluate impacts to individual parcels of property.

Defendants also submitted deposition testimony from some of the class representatives which, as explained later, served to clarify the nature of their losses.

## IV

### *The Trial Court's Analysis of the Evidence*

Plaintiffs contend the trial court acted within its discretion in crediting the expert evidence submitted by them over that submitted by defendants and concluding, as plaintiffs' experts opined, that liability and overall damages may be determined on a group basis. Plaintiffs argue their expert, Dr. Fountain, provided an "unequivocal conclusion" that the Lake Davis area suffered an

economic loss from the 2007 poisoning of approximately $5.5 million. Plaintiffs further assert their property appraisal expert, Mr. Gimmy, "reached an unequivocal conclusion that 'the dramatic decline in property values that occurred in the Lake Davis area after 2004' could only be attributed to the [2007 poisoning]."

Plaintiffs contend all of defendants' arguments to the contrary amount to an attempt to induce this court to reweigh the evidence presented to the trial court. Plaintiffs argue the proper standard is to determine whether substantial evidence supports the trial court's factual determination that common issues predominate, and defendants failed to establish such lack of substantial evidence.

It does appear, as plaintiffs contend, that the trial court credited their expert evidence over that submitted by defendants. In its order granting certification, the trial court described the expert declarations as follows:

"Declaration of Dr. James Fountain, Jr.: Common factual and legal issues presented include whether Plaintiffs can show a common impact to the Lake Davis area using the data analysis provided by Dr. Fountain and whether that common impact can be attributable to the 2007 [poisoning], or some other macro-economic influences. Such analysis includes identification of similar comparison counties; comparison of income, employment, retail sales, housing market and other data from various entities for several years; application of a particular input-output model to identify the full range of economic impacts; whether the RGL Report [the December 1, 2008 'Forensic Accountant Report on Economic Impact' prepared by RGL Forensics for the DFG] is methodologically flawed and/or represents an admission against interest on behalf of DFG; and whether a marketing efforts [sic] could help resuscitate the Lake Davis economy.

"Declaration of Arthur Gimmy: Common factual and legal issues presented include whether Plaintiffs can show a common impact to the Lake Davis residential property values as a result of the 2007 [poisoning] based upon the analysis methodology provided by Mr. Gimmy. Included in this analysis is a comparison of a comparable community and sales data for single family residences for both communities and whether there was a unique decline in property [sic] in the Lake Davis area attributed to the 2007 [poisoning].

"Declaration of Estelle Saltzman: Common factual and legal issues presented include whether the three year high profile strategic communication campaign as proposed in her declaration is an appropriate strategy to re-establish Lake Davis as a premier Northern California fishing destination amongst serious and recreational anglers.

"Declaration of Jeff Rogers: Common factual and legal issues presented include whether the general methodology identified to perform the proposed damages analysis is a legally sound methodology for computing individual damages for each claimant. This methodology would apply, if sound, to business owners, individuals who own a business and also own real estate and real estate owners who do not own a business. The approach to determine damages for each of these groups would be the same over the same period of time."

As for defendants' expert witnesses, the court stated:

"Declaration of Michael J. Harris, Ph. D.: Dr. Harris asserts Plaintiffs offered no evidence of common impact required for class certification and he argues at length that there is no way to establish common impact in the present case. Dr. Harris' declaration is 51 pages long and largely made up of argument against class certification. He does not, however, provide much, by way of facts, that rebut Plaintiffs' showings. At times, Dr. Harris does purport to provide facts, but provides no foundation for such alleged facts. Dr. Harris' declaration makes clear, as is noted below, that the proposed class have [*sic*] individual damages that will require individual determination.

"Declaration of James McCurley: Mr. McCurley's declaration demonstrates that there is a way to measure the economic impact to businesses in and around Portola, California following the 1997 and 2007 [poisonings]. Mr. McCurley's declaration challenges the ability to measure economic damages by a common methodology. The declaration does not state that a common economic impact cannot be found, merely that the measure of damages for individual claimants would not be accurate.

"Declaration of Reese Perkins: Mr. Perkins' declaration similarly demonstrates that there is a way to measure the economic impact to residential properties as a result of the 2007 [poisoning]. It appears that Mr. Perkins' declaration challenges the Plaintiffs' ability to provide an overall residential market analysis that takes into account the market value of the property prior to the 2007 [poisoning]."

Putting aside for the moment the trial court's assessment of the relative merits of the various expert declarations, it is readily apparent the court applied an erroneous procedure in assessing the evidence. The trial court described its task in analyzing the evidence on the question of whether common issues predominate as follows: "The proper legal criteria is whether the declarations presented by Plaintiffs constitute substantial evidence that predominant factual and legal issues make the case more amenable to class treatment. When looking at Defendants' declarations, the relevant inquiry is

whether they rebut Plaintiffs' substantial evidence." This description suggests the court first examines the proponent's evidence in isolation to determine if it satisfies the proponent's burden of showing that common issues predominate and then looks at the opponent's evidence to see if it rebuts that showing. In light of the trial court's description of the expert evidence, as described above, it appears that is in fact what the court did. However, that is not the proper procedure.

The trial court cited *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1301 [105 Cal.Rptr.3d 443] (*Jaimez*), where the Court of Appeal said: "[T]he trial court applied improper criteria in evaluating the merits of the [defendant] declarants' statements rather than considering whether they rebutted plaintiff's substantial evidence that predominant factual issues (if not legal, too) make this case more amenable to class treatment than to myriad individual adjudications . . . ."

The trial court reads this statement out of context. The *Jaimez* court was not saying the defendant's declarations must be considered only after determining if the plaintiff has shown that common issues predominate. *Jaimez* involved a claim by drivers for the defendant that they had been misclassified as exempt for purposes of state wage and hour laws and were denied overtime and meal breaks. The plaintiffs submitted declarations in support of class certification setting forth the defendant's general methods of operation and its practices and procedures regarding overtime and meal breaks. (*Jaimez, supra,* 181 Cal.App.4th at pp. 1294–1295.) The defendant responded with declarations from 25 purported class members, setting forth their own experiences of receiving meal breaks and overtime. (*Id.* at p. 1295.)

The trial court denied class certification, finding, among other things, that "common questions of law and fact did not predominate because [the defendant's] evidence demonstrated a strong indication of conflicting testimony at trial, which therefore precluded a finding of common questions of fact . . . ." (*Jaimez, supra,* 181 Cal.App.4th at p. 1296.) The trial court specifically noted that the defendant's declarations showed some of the purported class members did in fact receive meal breaks and overtime pay so " 'the members of the class don't hang together for typicality.' " (*Ibid.*)

██ The Court of Appeal reversed, explaining that the proper issue on a class certification motion is " 'whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment . . . .' " (*Jaimez, supra,* 181 Cal.App.4th at p. 1298.) According to the court, "[t]he trial court misapplied the criteria, focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class

treatment.' " (*Id.* at p. 1299.) In that case, the plaintiffs were pursuing their claim based on a theory that the defendant's overall policies and procedures caused harm to the class in general, regardless of whether individual class members were harmed. (*Id.* at p. 1300.)

*Jaimez* does not stand for the proposition that the trial court must first examine the plaintiffs' evidence and determine if it shows common issues predominate and then examine the defendants' evidence to determine if it rebuts that showing. In *Jaimez*, the court explained that what the trial court must do is examine all the evidence together in light of the plaintiffs' theory of recovery. If the plaintiffs choose to pursue their case on a theory that the defendants' policies and procedures adversely affected the class as a whole, regardless that some class members may not have been harmed, then the evidence presented must be evaluated on that basis.

Thus, the court does not look at the parties' evidence under a shifting burden of proof. The burden remains with the proponent of class certification to show common issues predominate. However, when assessing whether the plaintiff has satisfied that burden, the evidence must be evaluated under the prism of the plaintiff's theory of recovery. What that means in the present matter is that the evidence must be examined in light of plaintiffs' theory that the 2007 poisoning caused an overall decline in property values and economic activity, regardless of whether some members of the class may not have been harmed thereby.

In assessing the declarations of plaintiffs' experts, the trial court appears simply to have listed what it considered to be common issues of fact or law identified in them, without any attempt to evaluate the expert opinions. By contrast, the court appears to have undertaken an examination of the declarations of defendants' experts and found them wanting in many respects. For example, as to Dr. Harris, the court indicated he "does not . . . provide much, by way of facts, that rebut Plaintiffs' showings." Although the court acknowledged Dr. Harris purports to provide facts at times, it indicated he provided no foundation for those facts. One is, of course, left to wonder what *facts* could be presented by an expert who opines that it is not possible in this case to calculate losses on a global basis. It would obviously not be his function to rebut Dr. Fountain's calculations of common losses by presenting contrary calculations of his own.

Regarding defendants' other economic impact expert, Mr. McCurley, the trial court indicated his declaration "demonstrates that there is a way to measure the economic impact to businesses in and around Portola, California" and "does not state that a common economic impact cannot be found, merely that the measure of damages for individual claimants would not be accurate."

We are at a loss to understand how a common economic impact model that results in damage calculations that would not be accurate would be a usable one for purposes of this litigation. At any rate, in his declaration, McCurley states: "Based on my broad experience in the measurement of damages in the commercial setting and specific experience with business in and around Lake Davis, it is my opinion that a single format approach—i.e., common method-ology—to measuring economic damages for multiple claimants in connection with this matter would be inaccurate and not appropriate under the circum-stances." As reasons for this conclusion, McCurley states: "The reasons for this conclusion include the varied nature of the industries within the business community of the Lake Davis Area, the different economic pressures and influences felt by different industries, the differing levels of bookkeeping sophistication and record keeping methodologies used by different businesses and individuals, changes in local economic influences specific to individual businesses but unrelated to the treatment of Lake Davis including changes in contractual relationships, competition and the labor force among others. Finally, tourism obviously affects business differently and reduced tourism would not have a common impact on all businesses owned by proposed class members." We fail to see how the foregoing amounts to an acknowledgement by McCurley that there is a way to measure economic impacts in and around Portola.

As for defendants' real estate appraiser, Mr. Perkins, the trial court stated his declaration "demonstrates that there is a way to measure the economic impact" and he challenges only "[p]laintiffs' ability to provide an overall residential market analysis that takes into account the market value of the property prior to" the 2007 poisoning. To the extent the trial court surmises from the foregoing that Perkins acknowledged the decline in real property value can be determined on a group basis, as asserted by Gimmy, he did not. Perkins stated: "It is my opinion that a before and after analysis of individual residential properties would require an inspection of each subject property, research and analysis of comparable sales similar to the subject property with respect to age, quality, size, condition, location etc."

 It is of course not the function of the court at the class certification stage to resolve conflicts among the experts. (*In re Cipro Cases I & II, supra*, 121 Cal.App.4th at p. 412.) At this stage, the court merely considers "whether the evidence the plaintiffs will offer to establish aggregate damages will be sufficiently generalized in nature." (*Id.* at pp. 412–413.)

At the same time, it is not enough simply to note, as the trial court did here, that one expert opines that injury can be determined on a group basis while another opines that it cannot and conclude there is a common issue as to whether the first expert is correct. "When the trial court determines the

propriety of class action treatment, 'the issue of community of interest is determined on the merits and the plaintiff must establish the community as a matter of fact.' [Citation.] A ' ". . . class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " ' " (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 656 [22 Cal.Rptr.2d 419].)

■ In considering the expert evidence a plaintiff proposes to offer, the basis of the expert's opinions must be examined to determine if it is supported by the record. "[A]n expert's opinion is no better than the facts upon which it is based." (*Turner v. Workmen's Comp. Appeals Bd.* (1974) 42 Cal.App.3d 1036, 1044 [117 Cal.Rptr. 358].) "An expert's opinion which rests upon guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence." (*Garza v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 318, fn. 3 [90 Cal.Rptr. 355, 475 P.2d 451].) In assessing the plaintiff's expert evidence, the court should consider all the evidence, including that of the defendant's experts, in order to determine if the plaintiff's evidence establishes the predominance of common issues on the merits of the case. Were it otherwise, a "plaintiff could pick and choose among the facts to present to the court, providing an incomplete picture of the litigable issues, in order to ensure a certification." (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1448 [19 Cal.Rptr.3d 508].)

We conclude the trial court did not use the proper criteria for evaluating the expert evidence on the issue of whether common issues predominate.

V

*The Causes of Action of the Complaint*

"[T]he focus in a certification dispute is on what type of questions— common or individual—are likely to arise in the action, rather than on the merits of the case . . . ." (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 327.) As explained above, we must determine if "the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment. [Citations.] 'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question.' [Citations.]" (*Ibid.*)

After reviewing the expert evidence, the trial court undertook an analysis of the various claims in the complaint. The first cause of action is for nuisance. The court indicated plaintiffs have stated a claim for both public

and private nuisance. However, the claim itself cites only Civil Code sections 3479 and 3480, which do not encompass a private nuisance.

The elements of a public nuisance, under the circumstances of this case, are as follows: (1) the 2007 poisoning obstructed the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) the 2007 poisoning affected a substantial number of people; (3) an ordinary person would be unreasonably annoyed or disturbed by the 2007 poisoning; (4) the seriousness of the harm occasioned by the 2007 poisoning outweighed its social utility; (5) plaintiffs did not consent to the 2007 poisoning; (6) plaintiffs suffered harm as a result of the 2007 poisoning that was different from the type of harm suffered by the general public; and (7) the 2007 poisoning was a substantial factor in causing plaintiffs' harm. (See Judicial Council of Cal., Civ. Jury Instns. (2011) CACI No. 2020; *Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1548 [87 Cal.Rptr.3d 602].)

The elements of a private nuisance are the same except there is no requirement that plaintiffs prove a substantial number of people were harmed and plaintiffs suffered harm that was different from that suffered by the general public, but there are additional elements that plaintiffs owned, leased, occupied or controlled real property, that the 2007 poisoning interfered with plaintiffs' use of their property, and that plaintiffs were harmed thereby. (See Judicial Council of Cal., Civ. Jury Instns. (2011) CACI No. 2021.)

█ In their first cause of action, plaintiffs allege the 2007 poisoning adversely affected tourism for a substantial period of time, caused plaintiffs to suffer serious losses, obstructed the free use of plaintiffs' property, and interfered with plaintiffs' comfortable enjoyment of their property or their businesses. Strictly speaking, this does not state a claim for either public or private nuisance. There is no allegation that plaintiffs did not consent to the 2007 poisoning, that an ordinary person would have been annoyed or disturbed by the 2007 poisoning, or that the seriousness of the harm caused by the 2007 poisoning outweighed its public benefit. However, a motion for class certification is not the occasion to test the adequacy of the plaintiffs' pleadings or the merits of the case. As best we can tell, the first cause of action more closely states a claim for private than public nuisance.

The trial court identified the following common issues on the nuisance claim: whether defendants "[a]dded a rotenone-based poison to Lake Davis; [c]losed all roads that access Lake Davis; [p]laced large signs on Highway 70 advising the public that the lake was closed; . . . [o]ffended the Plaintiffs' senses; [o]bstructed free passage to, and use of, Lake Davis; [o]bstructed the free use of property; and unreasonably interfered with Plaintiffs' comfortable enjoyment of their property, the operation of their businesses, and the

exercise of their property rights." The court also identified common issues of whether the signs put out by defendants "led the general public to believe that the entire area was closed" and "remained in place well after the roads re-opened" and "whether an ordinary person would have been reasonably annoyed or disturbed" by the actions of DFG.

On the issue of harm to the individual class members, the court indicated plaintiffs' expert declarations "present substantial evidence that show that Plaintiffs might establish that the whole Lake Davis area suffered an economic decline as a result of the [2007 poisoning]; that overall business damages may be established, that class-wide property value declines may be established and that political subdivisions may have experienced a reduction in taxes and growth."

The court indicated the following issues may also be established by common proof: causation; whether the harm outweighed the benefit of the poisoning; whether a substantial number of people were affected; and whether plaintiffs' harm is different from that of the general public.

Finally, the court acknowledged that individual facts will be required to establish the extent to which defendants' conduct interfered with the class members' use and enjoyment of their property.

A number of the issues identified by the trial court as subject to common proof clearly are not. Whether the 2007 poisoning offended plaintiffs' senses, obstructed the free use of their property, or unreasonably interfered with the comfortable enjoyment of their property, operation of their businesses or exercise of their property rights clearly depends on the characteristics of the individual plaintiff and his or her property. While plaintiffs may be able to present evidence of a certain level of offense or interference as to all of them, the question whether such offense or interference rose to the level of a private nuisance cannot be determined on a group basis.

The trial court concluded plaintiffs' expert evidence shows they might be able to prove the whole Lake Davis area suffered an economic decline as a result of the 2007 poisoning, thereby establishing common liability for nuisance.

We fail to see how far such a showing would take plaintiffs in this matter. Dr. Fountain provided two declarations. In the first, he opined that the total economic loss suffered by those in the Lake Davis area between 2005 and 2008 as a result of the 2007 poisoning was over $10 million. How he arrived at those figures is unclear. In a subsequent declaration, Dr. Fountain provided significantly greater detail regarding his methodology. In that declaration, he

opined that total economic loss suffered by those in the City of Portola was $10,752,256; for Zip Code 96122, $18,734,055; and for Plumas County, $81,345,899. In his second declaration, Dr. Fountain explained he used the city, Zip Code and county demarcations because employment data broken down by those areas is available from government sources. We are left to guess how he was able to come up with like data for the Lake Davis area.

But even accepting Dr. Fountain's computations of overall losses caused by the 2007 poisoning in the Lake Davis area, the plaintiff class does not consist of everyone in that area. As defined in the complaint, the class consists of those in the Lake Davis area who submitted claims that were rejected by the Claims Board. Thus, assuming there was more than $10 million in economic decline in the Lake Davis area during the relevant period attributable to the 2007 poisoning, how do plaintiffs use this to establish their own aggregate losses? Dr. Fountain does not claim the overall losses in the area were suffered uniformly by all businesses or that any particular business or class of businesses is included in those who suffered losses. And if there were claims submitted to the Claims Board that were accepted, as opposed to those in the class whose claims were rejected, one might reasonably assume those claims were perhaps more viable than those of plaintiffs.

By using control counties, Dr. Fountain purportedly was able to factor out overall economic changes not attributable to the 2007 poisoning. But how will such overall decline be factored out of the losses suffered by an individual business? As explained by defendants' expert, McCurley, different economic pressures and influences apply to different types of businesses and changes in local economic influences specific to individual businesses come into play. Plaintiffs presented nothing to refute this assertion.

But more fundamentally, plaintiffs' theory of recovery, as supported by their expert declarations, is based on an overall decline in economic activity and property values caused by the 2007 poisoning. But that is not the relevant issue. Even if the economic decline could be localized to those in the Lake Davis area who submitted claims that were rejected, the question here is not whether there is an overall decline attributable to the 2007 poisoning but whether there is an overall decline attributable to the alleged nuisance. It is not enough merely to assume, as plaintiffs' experts have done, that every aspect of the 2007 poisoning amounted to a nuisance as to all plaintiffs. The issue is much more nuanced than that. It may be, for example, that the poisoning itself was not a nuisance, because the seriousness of the harm occasioned by it did not outweigh its social utility, yet the attendant acts of defendants, such as keeping roads closed too long or advertising the poisoning too widely, amounted to a nuisance. Certain of the acts may amount to a nuisance as to some plaintiffs but not as to others.

As for Gimmy's assessment of diminished property values in the Lake Davis area, his approach necessarily treats each parcel of property the same, regardless of characteristics or location. Gimmy acknowledges that actual losses must be determined on an individual basis. In light of this, one has to wonder what use can be made of Gimmy's declaration. It apparently establishes nothing more than that there was some average diminution in property values in the Lake Davis area during the relevant period that was not experienced in the control area around Lake Almanor and, hence, can be attributed to the 2007 poisoning. But, it is not enough simply to prove there was an average loss per parcel of property. All parcels are, more or less, different. Furthermore, and more importantly, the diminished values must be attributable to the alleged nuisance. There is no particular threshold of loss that qualifies a particular interference with property as a nuisance. Thus, it is not enough simply to show the average diminution in value among all properties in the Lake Davis area was, say, $10,000. One must look at the characteristics of each parcel, the reasonable expectations of the owner and the actual loss incurred to determine this. And, as explained above, one may not simply assume all aspects of the 2007 poisoning amounted to a nuisance as to all class members.

Furthermore, we find it astounding that none of plaintiffs' experts make any effort to deal with the presence of the northern pike in Lake Davis as a factor causing the economic decline or diminished property values suffered in the area during the relevant period or at least to explain why this is not a factor. Plaintiff Anthon Olsen, the class representative who owns and operates a cabin rental business near Lake Davis, submitted a declaration in which he asserted that prior to the 2007 poisoning he regularly operated at a profit but the 2007 poisoning drastically reduced the patronage at his business. However, in his deposition, Olsen admitted that he started having fewer customers even before the 2007 poisoning because of the presence of the northern pike in the lake. According to Olsen, business declined before the 1997 poisoning, rebounded thereafter, then began declining again after the pike was rediscovered. Later, Olsen was asked if he knew what caused the losses in his cabin rental business, and he answered, "The pike."

To make matters worse, plaintiffs' experts use the period from 2005 through 2008 to compute lost income and diminished property values. They selected 2005 because, allegedly, that is when DFG first announced it would be conducting a second round of poisoning. But from an economic loss standpoint, this makes no sense. If the touring public knows in 2005 that the lake will be poisoned in 2007, why would they stop coming to the area in 2005? One would expect just the opposite—that tourists would want to get in another year or two of recreation before the lake is poisoned. On the other hand, notice of the poisoning could be viewed as a warning that the pike problem is so bad that drastic measures must be taken, thereby discouraging

tourists from coming to the lake to fish. However, in that case, the loss in tourism would not be caused by the 2007 poisoning but by the pike.

 Class treatment is not barred where a single wrongful act has different effects on different claimants such that some may have claims while others may not. " 'In such cases, the Courts will generally certify a class if the defendant's action can be found to be wrong in the abstract even if no individual person has been damaged. [Citations.] These situations are distinguishable from situations where the Court cannot determine the wrongfulness of an action without reference to individuals. [Citations.]' " (*Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1427–1428 [47 Cal.Rptr.3d 83].)

As it relates to plaintiffs' nuisance claim, the present matter falls into the latter category. In light of the overall evidence presented, and particularly in light of the deficiencies in the declarations of plaintiffs' experts, it cannot reasonably be concluded common issues predominate on plaintiffs' nuisance claim.

Turning to plaintiffs' negligence claim, the trial court concluded the issues of duty and breach are subject to common proof as to each class member. According to the court, the same goes for causation, in light of plaintiffs' theory that the class members were commonly impacted. Only damages will require individual proof.

Again, we find the trial court's analysis overly optimistic as to how far common proof will take plaintiffs in proving their claim. On the issue of duty, the court explained: "Whether Defendants, in eradicating the Northern Pike, owed a duty of care to class members, i.e., property, business owners/operators, and political subdivisions within a specified geographic area, is all provable by common proof. Defendants proffer no reason why a court would need to engage in individualized analysis in order to answer that question. Common issues are present because Defendants' acts are the same with regard to each proposed class member."

 The foregoing betrays an apparent misunderstanding of the nature of the duty analysis the court will be required to undertake in this matter. "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) In the absence of a contractual requirement, the determination whether in a specific case a

defendant will be held liable to a third person "is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16]; see *Bily*, at p. 397.) Without question, foreseeability of harm is the key factor. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572–573 [224 Cal.Rptr. 664, 715 P.2d 624].)

In the present matter, plaintiffs do not allege defendants were negligent in deciding to undertake the 2007 poisoning. Rather, their claim is that the 2007 poisoning was undertaken in a negligent manner. In particular, plaintiffs allege "[t]he methods employed by Defendants fell below the applicable standard of care or was [*sic*] otherwise performed in violation of any statute, rule, ordinance or law" and "was [*sic*] undertaken in such a fashion so as to unnecessarily brand Lake Davis an undesirable 'poisoned' lake, dramatically affecting businesses, tax receipts, and real property values for a substantial period of time." According to plaintiffs, "Defendants failed to adequately address, consider and mitigate the impact to the local businesses and the City that would be directly affected by the Lake Davis closure, and particularly the negative publicity associated with dumping poisons into Lake Davis and its tributaries."

As explained above, in assessing the breadth of defendants' duty of care in connection with the way they conducted the 2007 poisoning, the trial court looks primarily to the foreseeability of harm. In the event the 2007 poisoning was undertaken negligently, such that the Lake Davis area was closed for longer than necessary or there was excessive negative publicity about the event, it is certainly reasonably foreseeable that businesses engaged in the tourist trade would be adversely affected. This would include such entities as a cabin rental business, a trailer park, or a bait shop. To a lesser extent, it would also include restaurants, grocery stores, pharmacies, and the like, which cater to both local clientele and tourists.

But once we move beyond businesses directly involved in selling goods and services to tourists, duty becomes less clear. It is certainly foreseeable, as the experts for both sides recognize, that harm to businesses in the tourist trade may result, in turn, in harm to other businesses. A nail salon that caters to locals may suffer a loss of income if business owners and employees in the tourist trade can no longer afford to have their nails done. Likewise, if the nail salon's business suffers, those working for the nail salon may no longer be able to afford the services of a local accountant. And, taking this a step or

two further, if the accountant's business suffers, he or she may purchase fewer office supplies or computer services, and the owner of an office supply store miles away may have to lay off workers.

██ "On a clear day, you can foresee forever." (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 307 [34 Cal.Rptr.2d 498].) But foreseeability is more than just a factor to be considered in a duty analysis. If there is no foreseeability, there is no duty. However, the opposite is not necessarily true. Foreseeability of injury does not necessarily require a finding of duty. (*Id.* at p. 306.) "Foreseeability supports a duty only to the extent the foreseeability is reasonable." (*Ibid.*) "The reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it. If injury to another ' "is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct" ' [citation], we must label the injury 'reasonably foreseeable' and go on to balance the other" factors relative to the duty analysis. (*Id.* at p. 307.) The concept of duty is designed " 'to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Bily v. Arthur Young & Co., supra*, 3 Cal.4th at p. 397.)

In the present matter, contrary to the trial court's conclusion, the existence of a duty with respect to many if not most of the plaintiff class members must be determined on an individual basis, based in part on such individual factors as the foreseeability of harm to the class member, the degree of certainty the particular class member suffered injury, and the closeness of the connection between the 2007 poisoning and the injury suffered. (*Biakanja v. Irving, supra*, 49 Cal.2d at pp. 650–651.)

Likewise, as with plaintiffs' nuisance claim, causation must be determined on an individual basis. With any given business, there may be a number of factors affecting income. Similarly, the impact of the 2007 poisoning on property values will depend on the relative proximity of the properties in question to the lake and the myriad other factors that go into valuation of real property. There may well have been a general perception that the area was somehow tainted, but the degree of diminution in value resulting from that perception will likely vary according to the location and nature of the property.

On plaintiffs' inverse condemnation claim, the trial court concluded this too is subject to common proof as to whether defendants' conduct rose to the level of a taking, with only the issue of damages being subject to individual proof. According to the court, "whether the Defendants' conduct constituted a taking or damaging of the Plaintiffs' property, as reflected by the proposed

sampling and impact methodologies identified in the declarations submitted by Plaintiffs' experts, may be demonstrated by common proof." Once again, we find the trial court has overstated what can be determined on a common basis.

■ "Both the state and federal Constitutions guarantee real property owners 'just compensation' when their land is 'taken . . . for public use . . . .' (Cal. Const., art. I, § 19; see U.S. Const., 5th Amend.) . . . The California Constitution also requires just compensation when private property is 'damaged for public use.' (Cal. Const., art. I, § 19.)" (*Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 12–13 [34 Cal.Rptr.3d 588].)

■ "Where the government action does not result in any physical invasion of property, the action will be considered a taking of property if the regulation deprives the owner of 'all economically beneficial or productive use of [the] land.' " (*Herzberg v. County of Plumas, supra,* 133 Cal.App.4th at p. 13.) "[R]esolving whether the government's action works a taking involves what the United States Supreme Court has described as 'essentially ad hoc, factual inquiries[.]' [Citations.] Several factors have particular significance. Specifically, the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action are relevant considerations. [Citation.] These three inquiries aim 'to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.' " (*Id.* at p. 14.) The ultimate goal is to "prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 618 [150 L.Ed.2d 592, 607, 121 S.Ct. 2448].)

In their inverse condemnation claim, plaintiffs allege defendants' conduct "in attempting to eradicate the Northern Pike for a public purpose has caused a substantial impairment to Plaintiffs' property rights and Plaintiffs were denied all economically beneficial uses of their property for a period of time during the 2007 poisoning. This substantial impairment constitutes a taking and damaging of Plaintiffs' property for which Plaintiffs are entitled to compensation." In the alternative, plaintiffs allege the 2007 poisoning drastically reduced tourism and/or the value of their property, or interfered with the sale of their property or collection of taxes to such an extent as to "severely frustrate[] the distinct investment-backed expectations of Plaintiffs . . . ."

Unlike their nuisance and negligence claims, plaintiffs' inverse condemnation claim appears to encompass not just the means used by defendants to

carry out the 2007 poisoning but the decision to undertake the 2007 poisoning in the first place. In effect, plaintiffs allege they have been forced to shoulder the entire burden of eradicating the northern pike so that it does not find its way into other bodies of water in the state.

However, like their nuisance claim, the viability of plaintiffs' inverse condemnation claim depends on the extent to which the 2007 poisoning interfered with the individual members' use of their property. This in turn will depend on the characteristics of the property itself as well as the expectations of the owner or the nature of the business conducted on that property. As explained above, a taking will be found only where the 'governmental action deprives the owner of all economically beneficial use of his or her property. A property owner who attempted to sell his or her property during the relevant period will likely have an easier time establishing a taking than one who did not do so and only had to endure the short-term inconveniences occasioned by the 2007 poisoning. Dr. Harris opined that any adverse impact to real property values was temporary or, at most, would be severely attenuated as time goes by. This was not refuted by plaintiffs' experts. A business tied intimately to tourism will likewise have an easier time proving a temporary taking than one that depends on tourism for only a portion of its business or is only secondarily impacted. In sum, the presence of a taking with respect to each member of the class, i.e., liability, cannot be determined on a global basis.

Turning next to plaintiffs' various interference with business claims, the trial court acknowledged these may require more individualized inquiry. Nevertheless, according to the court: "[T]o the extent that pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of the existence of these economic relationships may be used, as proposed in the declaration of Estelle Saltzman, common proof may be available. Plaintiffs also do present substantial evidence that it is possible to show the level of economic relationships before and after the [2007 poisoning], through class-wide economic modeling and trend-based estimates. Plaintiffs present substantial evidence that common proof can be presented to demonstrate whether Defendants' [sic] had knowledge of the economic relationships and whether their conduct was intentional or negligent."

We have searched in vain for any proposal in the declaration of Estelle Saltzman that "pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of the existence of . . . economic relationships" may be used to prove plaintiffs' interference claims. As best we can tell, Saltzman provided nothing more than an estimate as to how a media campaign might be conducted to improve the public perception of the Lake Davis area.

At any rate, plaintiffs' interference with business claims all turn on the change in economic activity at the various business establishments before and after the 2007 poisoning. This in turn requires an evaluation of the extent to which any such change was caused by the 2007 poisoning. In this regard, these claims fair no better than plaintiffs' nuisance and negligence claims. As explained above, plaintiffs have not demonstrated that the method utilized by Dr. Fountain to determine overall economic losses attributable to the 2007 poisoning can be adapted to prove liability or causation as to the members of the plaintiff class. Thus, both liability and damages must be established on an individual basis.

In their eighth cause of action, plaintiffs assert a claim for strict liability against DFG alone. In particular, they allege DFG's "application of Rotenone Poison in connection with the 2007 Poisoning constituted an ultrahazardous activity under California law." They further allege they were harmed and "[t]he harm Plaintiffs suffered was the kind of harm that would be anticipated as a result of the risk created by the 2007 Poisoning. Indeed [DFG] specifically anticipated that the 2007 Poisoning would cause residents and businesses [*sic*] owners living and/or working in the Lake Davis vicinity, and the City of Portola to incur economic losses."

The trial court concluded "[t]here is substantial evidence that common proof may be used to determine whether [DFG] should be strictly liable for the [2007 poisoning]," including whether the 2007 poisoning was an ultrahazardous activity, whether plaintiffs were harmed, whether the harm is of the kind to be anticipated from the activity, and whether the 2007 poisoning was a substantial factor in causing plaintiffs harm.

We agree with the trial court that issues regarding whether the 2007 poisoning constituted an ultrahazardous activity and whether the harm suffered by plaintiffs was the kind to be anticipated by the activity are subject to common proof. However, as to whether plaintiffs were harmed and whether the harm was caused by the 2007 poisoning, plaintiffs have not established that these can be proven on a group basis, as discussed more fully above. At any rate, even if we were to conclude the trial court could reasonably have determined common issues predominate on this claim, this would not change our overall view of the case. This is only one of nine causes of action. Furthermore, plaintiffs' claim that the harm suffered by them as a result of the application of rotenone poison to Lake Davis, i.e., reduced property values and economic decline, does not appear to be the type of harm that would make the poisoning an ultrahazardous activity. Thus, little weight should be placed on such a claim in assessing the overall nature of the case presented. "Common issues are predominant when they would be 'the principal issues in any individual action, both in terms of time to be expended

in their proof and of their importance . . . .' " (*Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at pp. 667–668.)

Finally, plaintiffs' equal protection claim is based on alleged differential treatment of those who were harmed by the 1997 poisoning and those who were harmed by the 2007 poisoning. According to plaintiffs, those harmed by the 1997 poisoning received in excess of $9 million in compensation, whereas DFG has suggested the 2007 poisoning resulted in an economic impact of less than 10 percent of that amount.

The trial court concluded plaintiffs' equal protection claim may be established by common proof. According to the court, "[w]hether the class is identical to the group that received compensation based upon Government Code section 998" and "[w]hether the Defendants' refusal to provide the class compensation for the [2007 poisoning] bears a rational relationship to a legitimate public purpose" may be established by common proof.

We cannot agree with the trial court that the issue whether plaintiffs are similarly situated to those who received compensation following the 1997 poisoning may be established by common proof. On the contrary, such a determination, perhaps more than any other, will depend on the characteristics of the individual property owners and business proprietors. Thus, even though Dr. Fountain may be able to come up with a comparison of overall losses following the 1997 poisoning with overall losses occasioned by the 2007 poisoning, a great deal of effort will be required to compare the plaintiff class members with those compensated after the 1997 poisoning.

## VI

### *Conclusion*

As explained earlier, although the trial court's ruling is entitled to substantial deference, it must be reversed if the court's findings are not supported by substantial evidence, if improper criteria were used, or if erroneous legal assumptions were made. (*In re Cipro Cases I & II, supra*, 121 Cal.App.4th at p. 409.) In this matter, the trial court applied improper criteria in assessing the evidence by first uncritically looking at plaintiffs' showing in support of their motion for class certification to see if it demonstrates the predominance of common issues and then looking to defendants' showing to see if it rebuts that showing. And the court failed to give any weight to the various opinions asserted by defendants' experts that appear to be rationally based and are not refuted by plaintiffs' experts. The court also made a number of erroneous legal assumptions as to how the elements of plaintiffs' various claims may be proven at trial. Finally, in light of deficiencies in plaintiffs' expert evidence as

to how those experts might establish both liability and damages with respect to the plaintiff subclasses, there is no substantial evidence to support the trial court's conclusion that common issues predominate.

■ Because group action has the potential to create injustice, "trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' [Citation.]" (*Linder, supra,* 23 Cal.4th at p. 435.) In assessing the benefit to the litigants, the concern is not solely with the plaintiffs. Where, as here, the claims asserted by the plaintiffs turn on many issues that depend on the circumstances of the various class members, a defendant required to proceed in a class action format may be denied the right to present a defense.

■ "[I]n determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 327.) In this matter, we conclude plaintiffs' theory of recovery, that the 2007 poisoning caused overall economic loss and diminution in property values that can be apportioned to the various class members, is not likely to prove amenable to class treatment. Under the circumstances of this case, the claims asserted by plaintiffs present far too few common issues to support the trial court's overall conclusion that common issues predominate. The trial court therefore abused its discretion in concluding there is a well-defined community of interest among the proposed class members.

The foregoing discussion has been restricted to subclasses A and B. Plaintiffs make no real effort to justify subclass C on its own. That class appears to have only one member, the City of Portola, although it has been suggested it may also contain a local resident who claims to have been deprived of the right to fish in Lake Davis during the 2007 poisoning. Obviously, the city, which claims reduced tax receipts, and the fisherman have no community of interests making them a proper class. And to the extent the class is composed of the city alone, a class of one is not a class. Hence, the trial court's order certifying all three subclasses cannot stand.

Having so concluded, we need not consider defendants' alternate arguments that plaintiffs are not adequate class representatives because they do not have claims typical of the various subclasses and plaintiffs cannot adequately represent the subclasses. Nor do we need to consider defendants' argument that they are entitled to a jury trial on the issue of damages.

## Disposition

The trial court's order certifying this matter as a class action was an abuse of discretion for which mandamus relief lies. A writ of mandamus is granted directing the trial court to vacate its order certifying the three subclasses and to enter a new order denying class certification. The alternative writ, having served its purpose, is discharged. Defendants are awarded their costs for this mandamus proceeding. (Cal. Rules of Court, rule 8.493(a)(1).)

Blease, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied August 23, 2011, and the petition of real parties in interest for review by the Supreme Court was denied November 16, 2011, S196376.